UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Nate L. Deschamps,

      Plaintiff,

    v.                                            Civil Action No. 2:15-cv-190-jmc

Commissioner of Social Security,

      Defendant.

## OPINION AND ORDER
(Docs. 10, 14)

Plaintiff Nate Deschamps brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security denying his applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). Pending before the Court are Deschamps's motion to reverse the Commissioner's decision (Doc. 10), and the Commissioner's motion to affirm the same (Doc. 14). For the reasons stated below, Deschamps's motion is DENIED, and the Commissioner's motion is GRANTED.

## Background

Deschamps was 30 years old on his alleged disability onset date of December 10, 2009. He exhibited behavioral problems in school and dropped out in the ninth grade. (AR 153, 276, 364–67, 377, 632.) He received special education services, and has always had great difficulty reading and writing, receiving very low grades in school and being

unable to read a newspaper as an adult.  (AR 145, 153, 377, 427, 476, 632–33.)

Deschamps's work experience is as a farm worker, a laborer, a tire changer, a construction

worker, and a newspaper delivery driver.  (AR 143–46, 326–33, 634–35.)  He lost two of his

most recent jobs because, in his words, he was "screwing off" and he "frightened" his

employer.  (AR 377–78.)

Deschamps has seven children, ranging in ages from approximately six to twenty, six

of them with different mothers.  (AR 376, 427, 476.)  He helps care for one of these children

and has no involvement with two of them (AR 427, 476); the record does not indicate his

involvement with the remaining four, other than to state he has "occasional" contact with

three of them (AR 427).  During the relevant period, Deschamps lived at his girlfriend's

house and spent time at the house of an "'old man' who ha[d] taken him under his wing"

and who delivered newspapers with Deschamps.  (AR 378; *see* AR 476.)  At other times

during the relevant period, he lived by himself, but with his mother staying often to prepare

meals, do household chores, and help him care for his daughter when she visited a few days

each week.  (AR 633, 646, 648–49.)

Deschamps has a long history of criminal activity resulting in incarceration for

crimes including forgery, cashing checks that did not belong to him, breaking and entering,

driving a dump truck without a commercial driver's license, and domestic assault.  (AR 377,

423–24, 427.)  On a typical day during the beginning of the alleged disability period,

Deschamps delivered newspapers at night, played on the internet, watched television, texted

and emailed with people, napped, visited with his girlfriend and their toddler, and helped his

mother mow her lawn.  (AR 157–63, 282, 378.)  He ate mostly sandwiches and microwave

meals which he bought or prepared on his own, managed his own hygiene, and did some cleaning occasionally.  (AR 159, 283–84, 378.)  Later in the alleged disability period, Deschamps spent his days reclining in a chair, watching television, and "wander[ing] around the house."  (AR 647.)  He went grocery shopping once a month, at times when the store was relatively unpopulated.  (*Id.*)  He saw his mother every day, and for three days a week he cared for his five-year old daughter with his mother's assistance.  (AR 648–49.)  His mother prepared his dinner and did most of the household chores.  (AR 646.)

Deschamps suffers from pain issues, mental health problems, and difficulty sleeping. He is morbidly obese and chews tobacco.  (AR 9, 1288, 1294–95, 427.)  He testified that he is unable to work because of back pain, knee problems, and an inability to get along with people.  (AR 636–37.)  He further testified that he is able to sit comfortably for only about ten minutes, stand in one spot for only about five minutes, and walk for only about one-tenth of a mile before his knees "giv[e] out."  (AR 642.)  Regarding his mental problems, Deschamps has been diagnosed with recurrent major depression, mood disorder NOS (not otherwise specified), personality disorder NOS, rule out bipolar disorder, probable learning disorder NOS, social anxiety disorder, and adjustment disorder with mixed emotion and explosive behavior.  (AR 379, 402, 425, 444–51, 475, 1253.)  Deschamps testified that he feels tense, nervous, aggravated, and impatient around people, and thus tries to avoid them. (AR 146, 377, 650.)  He stated that he "tell[s] people how it is and usually that ends . . . in confrontation."  (AR 146.)  He described himself as always having been "somewhat depressed" (AR 377) and "moody," to the point of frightening those close to him (AR 376).

In December 2009, Deschamps filed applications for SSI and DIB alleging that he stopped working on September 15, 2008[1] because of his bipolar disorder.  (AR 243–52, 275.)  The applications were denied initially and upon reconsideration, and Deschamps timely requested an administrative hearing, which was conducted on January 4, 2012 by Administrative Law Judge (ALJ) Paul Martin.  (AR 134–72.)  Deschamps appeared and testified, and was represented by an attorney.  A vocational expert (VE) also testified at the hearing.  On February 24, 2012, ALJ Martin issued a decision finding that Deschamps was not disabled under the Social Security Act from his alleged disability onset date through the date of the decision.  (AR 62–72.)  Thereafter, the Appeals Council denied Deschamps's request for review, rendering the ALJ's decision the final decision of the Commissioner.  (AR 1–3.)  Having exhausted his administrative remedies, Deschamps filed a Complaint with this Court on August 7, 2013.

On April 24, 2014, upon consideration of an assented-to motion for an order remanding the matter for further administrative proceedings, this Court reversed and remanded the matter.  (AR 690.)  Soon thereafter, the Appeals Council vacated ALJ Martin's February 2012 decision; ordered that Deschamps's claim be consolidated with a claim he filed in July 2013 (*see* AR 970–80); and remanded the matter for consideration of newly submitted evidence including Dr. Burdick's June 2012 opinion, reassessment of Deschamps's residual functional capacity, and further testimony from a VE if warranted. (AR 698–99.)

---

[1] Deschamps later amended his alleged disability onset date to December 10, 2009.  (AR 599, 631.)

On May 19, 2015, a second administrative hearing was held, this time before ALJ Matthew Levin.  (AR 627–63.)  Deschamps again appeared and testified, and was represented by an attorney; and a VE also testified at the hearing.  On June 18, 2015, ALJ Levin issued a decision finding that Deschamps was not disabled under the Social Security Act at any time from his alleged disability onset date of December 10, 2009 through the date of the decision.  (AR 599–611.)  After the ALJ's decision became final, Deschamps filed the Complaint in this action on August 27, 2015.  (Doc. 3.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d).  The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity (RFC), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and

other evidence in the record.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).  The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Levin first determined that Deschamps had not engaged in substantial gainful activity since his alleged disability onset date.  (AR 602.)  At step two, the ALJ found that Deschamps had the following severe impairments: degenerative changes of the spine, obesity, asthma, depression, anxiety, and a personality disorder.  (*Id.*)  Conversely, the ALJ found that Deschamps's diabetes mellitus, patella-femoral syndrome, sleep apnea syndrome, low intellectual ability, and lateral epicondylitis were non-severe.  (AR 603–04.)  At step three, the ALJ found that none of Deschamps's impairments, alone or in combination, met or medically equaled a listed impairment. (AR 604–06.)

Next, the ALJ determined that Deschamps had the RFC to perform light work, as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except as follows:

> [Deschamps] needs to avoid all ropes/ladders/scaffolds, but he can occasionally climb stairs/ramps and he can occasionally balance, stoop, kneel, crouch[,] and crawl. He needs to avoid exposure to hazards. He is limited to simple, unskilled work. He must avoid social interaction with the general public, but he can sustain brief, superficial social interaction with co[]workers and supervisors in a semi-isolated work location. With these limitations, he can maintain attention and concentration for 2-hour increments throughout an 8-hour workday.

(AR 606.) Given this RFC, the ALJ found that Deschamps was unable to perform his past relevant work as a construction worker, a dairy farm worker, a tire changer, and a newspaper delivery driver. (AR 610.) Finally, based on testimony from the VE, the ALJ determined that Deschamps could perform other jobs existing in significant numbers in the national economy, including the jobs of office cleaner, price marker, and flower care worker. (AR 610–11.) The ALJ concluded that Deschamps had not been under a disability from the alleged onset date of December 10, 2009 through the date of the decision. (AR 611.)

### Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found disabled only if his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991).

Finally, in its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

### Analysis

Deschamps claims the ALJ erred in finding that his learning disorder was not a severe impairment. He further contends that the ALJ erred in his analysis of several medical opinions. In response, the Commissioner asserts that the ALJ's decision is supported by substantial evidence and complies with the applicable legal standards. After thoroughly reviewing the record, the Court finds as follows: (1) even if the ALJ erred in finding Deschamps's learning disorder non-severe at step two, the error was harmless; (2) the ALJ did not err in his analysis of the medical opinions; and (3) the ALJ's decision is supported by substantial evidence.

Although there is evidence to support the positions of both Deschamps and the Commissioner, as stated above, the court's factual review of the ALJ's decision is limited to

determining whether "substantial evidence" exists in the record to support it. 42 U.S.C. § 405(g); *Rivera*, 923 F.2d at 967; *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."). It is not the function of the court to determine *de novo* whether a plaintiff is disabled. *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996). Rather, the court "conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009); *see* 42 U.S.C. § 405(a) (on judicial review, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive"). "Substantial evidence" means, merely, "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Moran*, 569 F.3d at 112 (quoting *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008)). As the Second Circuit explained, this is "a very deferential standard of review—even more so than the 'clearly erroneous' standard." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citing *Dickinson v. Zurko*, 527 U.S. 150, 153 (1999)). The substantial evidence standard means, "once an ALJ finds facts, [the court] can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Id.* (internal quotation marks omitted). Here, the Court does not find that a factfinder would have to conclude other than the ALJ did, and that substantial evidence supports the ALJ's decision, as discussed below.

## I.     ALJ's Step-Two Finding Regarding Severity of Learning Disorder

Deschamps first argues that the ALJ erred in his step-two assessment that

Deschamps's learning disorder was not a severe impairment.  It is the claimant's burden to

show at step two that he has a "severe impairment," meaning an impairment which

"significantly limits [the claimant's] physical or mental ability to do basic work activities."

20 C.F.R. §§ 404.1520(c), 416.920(c); *see Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987)

("It is not unreasonable to require the claimant, who is in a better position to provide

information about his own medical condition, to do so.").  An impairment is "not severe"

when medical evidence establishes "only a slight abnormality . . . which would have no

more than a minimal effect on [the claimant's] ability to work."  SSR 85-28, 1985 WL

56856, at *3 (1985).  Importantly, the omission of an impairment at step two does not in and

of itself require remand and may be deemed harmless error.  *See Pompa v. Comm'r of Soc.

Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) ("Because the ALJ found that Pompa had a

severe impairment at step two of the analysis, the question of whether the ALJ characterized

any other alleged impairment as severe or not severe is of little consequence."); *Johnson v.

Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) (applying harmless error standard in social

security context, and holding that, "where application of the correct legal principles to the

record could lead to only one conclusion, there is no need to require agency

reconsideration").  This is particularly true where the disability analysis continued and the

ALJ considered all of the claimant's impairments in combination in his RFC determination.

*See Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (finding alleged step-two

error harmless because ALJ considered impairments during subsequent steps); *Stanton v. Astrue*, 370 F. App'x 231, 233, n.1 (2d Cir. 2010) (same).

Here, even if the ALJ erred in finding that Deschamps's learning disorder was not severe, the error was harmless, as the ALJ continued the disability analysis past step two and accounted for all of Deschamps's impairments in combination in his RFC determination.  Specifically, with respect to Deschamps's learning disorder, the ALJ found that Deschamps was limited to "simple, unskilled work" and could maintain attention and concentration for only two-hour increments.  (AR 606.)  Moreover, the ALJ accurately stated as follows in his analysis of the severity of Deschamps's learning disorder:

> [Deschamps] has been described as having low intellectual ability.  Testing on the K-BIT-2 revealed an IQ score of 77[;] however, this report[] also indicates that such testing is not a substitute for a comprehensive measure of intelligence.  In this case, despite [Deschamps's] lengthy treatment with Dr. Koo, no diagnosis of learning difficulties was made by this treating psychiatrist.  Additionally, [Deschamps] performed semi-skilled work at substantial gainful levels for many years and in November 2013, he was even working to obtain a [commercial driver's] license.  He has also acknowledged that he is able to use a computer, shop in stores, handle a savings account, count change[,] and drive.

(AR 603–04 (citations omitted).)  These findings are supported by substantial evidence. (*See* AR 166–67, 282–83, 285–86, 339, 378, 1228, 1319.)  Regarding the K-BIT-2 testing, although VocRehab Vermont counselor Gail Parkhurst stated that Deschamps's IQ score of 77 was "below average," she noted that the test was "NOT a substitute for a comprehensive measure of intelligence," and concluded that the test results "indicate [Deschamps] doesn't have any learning or cognitive impairments."  (AR 1319.)  Regarding the commercial driver's license, a treatment note prepared by physician's assistant Davidson states:

"[Deschamps] is currently working on getting his [commercial driver's] license."  (AR 1228.)  The note also states: "He is feeling well at this time, has no complaints."  (*Id.*)

Most notably, the record does not contain a conclusive diagnosis of a learning disorder.  Dr. Andrew Koo, Deschamps's treating psychiatrist since August 2010 (AR 475), did not diagnose Deschamps with a learning impairment.  Deschamps relies on diagnoses provided by examining psychological consultant Gregory Korgeski, PhD (AR 379), nonexamining psychiatric agency consultant Joseph Patalano, PhD (AR 396), and examining neurobehavioral consultant Deborah Black, MD (AR 430).  But Dr. Korgeski found that Deschamps had a "*probable* learning disability" (AR 379 (emphasis added)); Dr. Patalano assessed Deschamps as having a *rule-out* diagnosis of learning disorder (AR 396 (emphasis added)); and Dr. Black stated that Deschamps's "very impaired cognitive profile may be related to several different factors," including depression, sleep deprivation, and medication side effects (AR 430).  Dr. Koo identified Deschamps's depression, not his learning disorder, as his primary diagnosis, consistently finding Deschamps to be depressed, irritable, and moody but having normal speech, thought processes, insight, judgment, and fund of knowledge; and to be alert and attentive at most appointments.  (*See, e.g.*, AR 42–47, 469–76, 507–12, 531–36, 543–48, 584–89, 1111–12, 1194–95, 1216–19, 1250–51, 1266–67, 1313–14, 1326–27, 1357–58, 1418–34, 1467–68, 1483–84, 1492–96.)

Deschamps claims that, in assessing whether his learning disorder was severe, the ALJ should have considered that Dr. Korgeski assigned a Global Assessment of Functioning

(GAF) score of 50 to him.[2]  (*See* AR 379.)  But the ALJ was not required to expressly

discuss every aspect of Dr. Korgeski's opinions.  *See Brault*, 683 F.3d at 448 ("an ALJ is

not required to discuss every piece of evidence submitted[, and] [a]n ALJ's failure to cite

specific evidence does not indicate that such evidence was not considered") (internal

quotation marks and citation omitted).  Moreover, a low GAF score–in and of itself–does

not demonstrate that an impairment significantly interfered with a claimant's ability to

work.  *Parker v. Comm'r of Soc. Sec. Admin.*, No. 2:10-cv-195, 2011 WL 1838981, at *6

(D. Vt. May 13, 2011) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th

Cir. 2006) ("[W]e are not aware of any statutory, regulatory, or other authority requiring the

ALJ to put stock in a GAF score.")).  Rather, a claimant's GAF score is only "one factor" to

consider in determining his ability to perform substantial gainful activity.  *Parker*, 2011 WL

1838981, at *6 (citation omitted); *Ortiz Torres v. Colvin*, 939 F. Supp. 2d 172, 184

(N.D.N.Y. 2013).  Further, a GAF score generally assesses the claimant's level of

functioning "at the time of the evaluation" only.  *DSM-IV* at 30.  Thus, if the provider saw

the patient only one time, as Dr. Korgeski did here, the score is less valuable.

Deschamps also argues that ALJ Levin violated the "law of the case" doctrine by

finding that Deschamps's learning disorder was non-severe, despite ALJ Martin's finding in

---

[2]  "The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking
the clinical progress of individuals [with psychological problems] in global terms.'"  *Kohler v. Astrue*, 546
F.3d 260, 262 n.1 (2d Cir. 2008) (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of
Mental Disorders* 32 (4th ed. 2000) (*DSM–IV*)).  Under the *DSM–IV*, Deschamps's GAF score of 50
indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR
any serious impairment in social, occupation, or school functioning (e.g., no friends, unable to keep a job)."
*Id.*  In 2013, the American Psychiatric Association published the *DSM–5*, which "drop[s]" reference to the
GAF "for several reasons, including its conceptual lack of clarity . . . and questionable psychometrics in
routine practice."  Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed.
2013) (*DSM–5*).

the initial decision that it was severe.  (*See* Doc. 10-1 at 19; Doc. 17 at 1–4; *compare* AR 64–65 *with* AR 603–04.)  This finding in ALJ Martin's decision, however, is equivocal: the ALJ included "*probable* learning disorder" in his list of severe impairments (AR 64 (emphasis added)), and stated: "[Deschamps's] records . . . show a history of learning disability in spelling and reading" (AR 65).  Despite this finding, ALJ Martin stated later in his decision: "[A]lthough [Deschamps's] records note a *possible* learning disorder, *there is no evidence in the record that this resulted in disabling functional limitations.*  At his consultative examination, [Deschamps] was noted to have average intellectual ability[;] adequate memory, attention[,] and concentration[;] and an average fund of information."  (AR 69 (citation omitted) (emphases added).)  Clearly, ALJ Martin did not find that Deschamps's learning disorder significantly limited his ability to work; and thus ALJ Levin did not violate the law of the case doctrine in finding the impairment non-severe.

For these reasons, the Court finds that, even if the ALJ erred in failing to assess Deschamps's learning disorder as a severe impairment, the error was harmless, as the ALJ considered the relevant evidence regarding the disorder and adequately accounted for its effect on Deschamps's ability to work in his RFC determination.

## II.    ALJ's Analysis of the Medical Opinions

Next, Deschamps argues that the ALJ erred in his analysis of the medical opinions of the following treating and consulting medical professionals: treating primary care physician Timothy Burdick, MD; treating primary care physician Brian Rodriguez, MD; treating physician's assistant Robert Davidson, PA; treating counselor Yannick Chassereau, MA; and nonexamining agency consultants Joseph Patalano, PhD, Edward Hurley, PhD, Thomas

14

Reilly, PhD, and Howard Goldberg, PhD.  According to Deschamps, the ALJ's error in analyzing these opinions resulted in an improper RFC determination.  As discussed below, the Court finds no error.

### A.    Timothy Burdick, MD

Dr. Burdick was Deschamps's primary care provider starting in May 2009.  In a treatment note from that month, Dr. Burdick stated that, given Deschamps's sleep/mood problems and history of incarceration, he would need to discuss with Deschamps "the possible mood disorder spectrum."  (AR 372.)  A December 2009 treatment note states that Deschamps reported to Dr. Burdick that he was extremely irritable and tense, and did not leave his home for fear that he "will end up beating somebody up."  (AR 369.)  Dr. Burdick assessed Deschamps with mood disorder NOS and rule out bipolar disorder.  (*Id.*)  In February 2010, Dr. Burdick completed a General Assistance and 3SquaresVT form for Deschamps, opining that he had a mood disorder and personality disorder NOS which prevented him from being able to work or train "for the foreseeable future."  (AR 1253.)  In June 2012, Dr. Burdick completed a Medical Source Statement of Ability to Do Work-Related Activities (MSS) for Deschamps, wherein he identified marked and extreme limitations in several mental functional areas, and indicated that Deschamps's mood disorder/posttraumatic stress disorder and personality disorder resulted in him being unable to work or train.  (AR 1164–66; *see also* AR 13–15.)  In December 2012, Dr. Burdick completed another General Assistance form for Deschamps, diagnosing him with mood disorder, chronic pain, and a history of head injury; and opining that he should be exempted from training or employment requirements and was unlikely to improve.  (AR 1316.)

The ALJ was required to analyze Dr. Burdick's opinions under the "treating physician rule," given his status as Deschamps's treating physician during the relevant period.  Under that rule, a treating source's opinion on the nature and severity of a claimant's condition is entitled to "controlling weight" if it is "well[]supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."  20 C.F.R. § 404.1527(c)(2); *see Schisler v. Sullivan*, 3 F.3d 563, 567–69 (2d Cir. 1993).  The deference given to a treating source's opinion may be reduced, however, in consideration of other factors, including the length and nature of the treating source's relationship with the claimant, the extent to which the medical evidence supports the treating source's opinion, whether the treating source is a specialist, the consistency of the treating source's opinion with the rest of the medical record, and any other factors "which tend to . . . contradict the opinion."  20 C.F.R. § 404.1527(c)(2)–(6); *see Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).  If the ALJ gives less than controlling weight to a treating source's opinion, he must provide "good reasons" in support of that decision.  *Burgess*, 537 F.3d at 129–30.

Here, the ALJ assigned little weight to Dr. Burdick's opinions on the grounds that they are inconsistent with and unsupported by the Doctor's own treatment notes, and inconsistent with Deschamps's daily activities.  (AR 609.)  As discussed above, these were proper factors for the ALJ to consider in assessing the value of Dr. Burdick's opinions.  *See* 20 C.F.R. § 404.1527(c)(3) ("[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion"); *id.* at (c)(4) ("the more consistent an opinion is with the record as a

16

whole, the more weight we will give to that opinion").  Moreover, substantial evidence supports the ALJ's assessment.  Specifically, the ALJ noted that Dr. Burdick suggested in a treatment note that Deschamps had been working in a hot, wet environment; and in another treatment note, Dr. Burdick indicated that Deschamps had normal mood, affect, and thought.  (AR 609; *see* AR 1147, 1409.)  In fact, many of Dr. Burdick's treatment notes indicate that Deschamps had normal cognition, behavior, and mood.  (*See, e.g.*, AR 415, 420, 463.)  Moreover, as the ALJ noted, the record indicates that Deschamps engaged in outdoor activities like pulling a tree with a tractor.  (AR 609; *see* AR 531.)  Deschamps asserts that the ALJ "ignored numerous references in Dr. Burdick's records since May 2009 that he treated Mr. Deschamps for sleep disorder, mood disorder, ankle pain[,] and knee pain."  (Doc. 10–1 at 22.)  But the ALJ was not required to discuss every "reference" in each of Dr. Burdick's treatment notes.  *See Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam) ("When, as here, the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.")  Further, the fact remains that Dr. Burdick's treatment notes contain few objective abnormalities.

## B.    Brian Rodriguez, MD

Dr. Rodriguez was another of Deschamps's treating physicians during the alleged disability period, primarily treating Deschamps's diabetes and pain complaints.  In October 2014, Dr. Rodriguez completed a General Assistance and 3SquaresVT form wherein he opined that Deschamps should be exempted from training or employment requirements due

to his mood disorder, chronic pain, and bipolar disorder.  (AR 1108.)  The ALJ assigned little weight to this opinion on the grounds that it, like Dr. Burdick's opinions, is inconsistent with the Doctor's own treatment notes.  (AR 609–10.)  Substantial evidence supports this finding.  For example, as the ALJ noted, a few months after he completed the General Assistance form, Dr. Rodriguez stated in a treatment note that Deschamps had normal mood, affect, and judgment.  (AR 609; *see* AR 1344, 1375 (normal mood, affect, and behavior).)  That treatment note also indicates that Deschamps's primary issues at the time (January 2015) were with night sweats, diabetes, and knee pain, not mental health problems.  (AR 1342–45.)  In general, Dr. Rodriguez's treatment notes indicate that he mainly treated Deschamps's physical impairments, not his mental health conditions, thus providing little support for his opinion that Deschamps's mood disorder and bipolar disorder rendered Deschamps unable to work.  For example, in April 2015, Dr. Rodriguez saw Deschamps in follow-up regarding his diabetes and listed the following conditions in his "Assessment" of Deschamps, notably omitting any mental disorders: "morbid obesity, chronic knee pain, exacerbation of back pain[,] and [type 2 diabetes]."  (AR 1375.)

Deschamps asserts that the ALJ did not consider several of his complaints which were documented in Dr. Rodriguez's treatment notes, including complaints of night terrors, night sweats, and knee pain.  (*See* Doc. 10–1 at 23.)  But again, ALJs are not required to comment on every patient complaint documented in the medical record.  *See Brault*, 683 F.3d at 448.  And Deschamps's complaints, as recorded by Dr. Rodriguez, do not diminish the fact that Dr. Rodriguez's treatment notes contain scarce objective examination findings.

### C.     Robert Davidson, PA

Another of Deschamps's providers during the relevant period was Robert Davidson, a physician's assistant who treated Deschamps in conjunction with Dr. Burdick and Dr. Rodriguez.  In November 2013, Davidson completed a General Assistance and 3SquaresVT form, wherein he opined that Deschamps was exempted from training or employment requirements due to mood disorder, chronic pain, and history of head injury.  (AR 1488.)  In July 2014, Davidson completed a MSS, wherein he identified physical RFC restrictions– including chronic low back pain, burning sensation in left foot, and chronic right knee pain– which would preclude Deschamps from performing even sedentary work.  (AR 1221–26.) The ALJ gave little weight to these opinions, finding that they are inconsistent with Davidson's own treatment notes and stating that Davidson is not an "acceptable medical source."  (AR 609.)  These were proper factors for the ALJ to consider in assessing the weight of Davidson's opinions.

"Acceptable medical sources" are defined in the regulations to include licensed physicians, psychologists, optometrists, podiatrists, and qualified speech-language pathologists, 20 C.F.R. § 404.1513(a), whereas sources such as physician's assistants are defined as "other sources," 20 C.F.R. § 404.1513(d)(1).  ALJs are not required to evaluate the opinions of "other sources" in the same manner as required under the treating physician rule.  20 C.F.R. § 404.1527(d)(2); *see* SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006); *Duran v. Comm'r of Soc. Sec.*, 296 F. App'x 134, 136 (2d Cir. 2008) (finding no error in ALJ decision to disregard assessment of "medical records physician" because it was not from an acceptable medical source and did not include clinical findings).  Nonetheless,

these "other source" opinions are entitled to some weight, given that they may be used "to show the severity of [the claimant's] impairment(s) and how it affects [the claimant's] ability to work."  20 C.F.R. § 404.1513(d)(1); *see* SSR 06-03p, 2006 WL 2329939, at *2. ALJs are required to use the same factors for evaluating "other source" opinions as are used to evaluate opinions from "acceptable medical sources," including the length and nature of the source's relationship with the claimant, the extent to which the medical evidence supports the source's opinion, and the consistency of the opinion with the rest of the medical record.  SSR 06-03p, at *4 (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)).

The ALJ appropriately considered that Davidson was not an acceptable medical source and that his opinions are not consistent with his own clinical notes.  Specifically, the ALJ pointed out that, in a November 2013 treatment note, Davidson described Deschamps as "feeling well at this time" and "ha[ving] no complaints," which is clearly inconsistent with his opinion that Deschamps's limitations were so severe that he could not work.  (AR 1228; *see* AR 609.)  Deschamps argues that the ALJ "failed to mention that there was no physical examination" and that the ALJ "ignored that on January 20, 2014, Mr. Davidson noted recent diagnosis of diabetes, recurrent, intermittent low back pain[,] and collapsing right knee."  (Doc. 10–1 at 24 (citing AR 1228, 1232).)  These facts do not reveal any error in the ALJ's analysis, however, and again, ALJs are not required to expressly discuss all evidence in the record.

### D.    Yannick Chassereau, MA

The Court also finds no error in the ALJ's analysis of the opinions of counselor Chassereau.  Deschamps began seeing Chassereau in April 2010 because Deschamps was

isolating himself and experiencing symptoms of depression, including moodiness, after breaking up with his partner.  (AR 422–23.)  Chassereau recorded that Deschamps "exhibit[ed] some symptoms of depression due to environmental stressor," and "could benefit from short term therapy to work on stabilizing his mood, managing his anger[,] and decreasing his explosive behavior."  (AR 425.)  In April 2011, Chassereau opined that Deschamps had "[m]arked" restriction of activities of daily living and "[i]ntense and unstable interpersonal relationships and impulsive and damaging behavior."  (AR 504.) Chassereau further opined that Deschamps's ability to concentrate was "[m]oderately" affected by his mental limitations, and that these limitations compromised his ability to deal with stress, interact with others, handle anger, and sustain activities on a regular and sustained basis.  (AR 505.)  In November 2011, Chassereau opined that Deschamps had "[m]arked" limitations in his ability to perform daily activities.  (AR 554.)

The ALJ gave little weight to Chassereau's opinions on the grounds that they are conclusory and unsupported by Deschamps's actual reported activities, including spending time with his young daughter, using a computer, shopping, handling legal matters, and engaging in activities like working outside pulling a tree with a tractor.  (AR 609.)  As discussed above, it was proper for the ALJ to consider whether Chassereau's opinions are supported and consistent with the record in assessing their value.  Moreover, the ALJ's findings are supported by the record.[3]  (See AR 283–85, 511, 531, 1250, 1473.)  The ALJ

---

[3]  Though not mentioned in the ALJ's decision, it is worth noting here that a July 2014 treatment note from another of Deschamps's medical providers states, presumably in reference to counselor Chassereau who was Deschamps's therapist at the time: "[Deschamps] disagrees with the therapist's decision to clear him to return to work.  He doesn't feel he is ready to return to work, that staying at home with his son is all he can handle at this time."  (AR 1124.)

also noted that psychiatrist Dr. Koo, who treated Deschamps at the same time that counselor Chassereau did, declined to complete an opinion in support of Deschamps's disability application.  (AR 609; *see* AR 38–40.)  In response to a June 2012 request to complete a MSS (Mental) which would assess the degree that Deschamps's mental impairments limited his ability to function, Dr. Koo stated: "I am not able to provide the degree and type of assessment that you are seeking."  (AR 38.)

Deschamps cites to other evidence from the treatment record which he claims supports Chassereau's opinions, including Chassereau's observation that Deschamps has "'difficulties in tolerating frustration, disappointment[,] and interpersonal conflicts.'" (Doc. 10-1 at 25 (quoting AR 505).)  But, as stated above, the question is not whether there is evidence to support Deschamps's arguments, but rather, whether there is substantial evidence to support the ALJ's decision.  And when the court reviews the record for substantial evidence, it reviews the record as a whole, meaning that, "in assessing whether the evidence supporting the [ALJ's] position is substantial, [the court] will not look at that evidence in isolation but rather will view it in light of other evidence that detracts from it." *Alston*, 904 F.2d at 126 (internal quotation marks omitted).  Moreover, "[r]esolution of genuine conflicts between the opinion of [a] treating source, with its extra weight, and any substantial evidence to the contrary *remains the responsibility of the fact-finder*."  *Schisler v. Bowen*, 851 F.2d 43, 47 (2d Cir. 1988) (emphasis added).  The Court finds that substantial evidence supports the ALJ's analysis of Chassereau's opinions.

### E.   Agency Consultants Drs. Patalano, Hurley, Reilly, and Goldberg

Finally, Deschamps argues that the ALJ erred in affording great weight to the opinions of nonexamining agency consultants Dr. Patalano, Dr. Hurley, Dr. Reilly, and Dr. Goldberg, who opined that Deschamps could do simple, low-stress work involving limited interaction with the public.  (*See* AR 394, 461, 478, 721–22, 753–54.)  The Court finds no error.

The regulations permit the opinions of nonexamining agency consultants to override those of treating physicians when the former are more consistent with the evidence than the latter.  *See Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995) (citing *Schisler v. Sullivan*, 3 F.3d 563, 567–68 (2d Cir. 1993)) ("[T]he regulations . . . permit the opinions of nonexamining sources to override treating sources' opinions provided they are supported by evidence in the record."); SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996) ("In appropriate circumstances, opinions from State agency . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources.").  Here, the opinions of Drs. Patalano, Hurley, Reilly, and Goldberg are more consistent with the record than those of the treating sources and examining consultants discussed above.  The ALJ explained his decision to give great weight to the agency consultant opinions as follows: "These sources reviewed the medical evidence and they are also specialists in the area of mental health issues.  Moreover, their opinions are consistent with even the more recent medical records showing mostly normal mental status examinations and stable mood."  (AR 609.)  Substantial evidence supports this explanation, as discussed above.

Deschamps asserts that Dr. Hurley's opinions should not have been given great weight because the Doctor did not adopt Dr. Korgeski's diagnosis of probable learning disability.  As stated above, however, Dr. Korgeski's diagnosis was not definitive.  Moreover, the ALJ properly considered the evidence related to Deschamps's learning difficulties and accounted for these difficulties in his RFC determination, finding that Deschamps could do only simple, unskilled work and could maintain attention and concentration for only two-hour increments.  (AR 606.)  Deschamps further asserts that the opinions of Drs. Hurley, Reilly, and Goldberg should not have been afforded great weight because they do not mention Dr. Black's report.  But there is no authority requiring agency consultants to expressly mention every medical report they reviewed; and Dr. Black's report is not inconsistent with any of Dr. Hurley's, Dr. Reilly's, or Dr. Goldberg's opinions.  Additionally, although Dr. Black described Deschamps as having a "very impaired cognitive profile," she stated that she was not sure if this was caused by a learning disability, sleep deprivation, medication side effects, or something else.  (AR 430.)  Furthermore, Dr. Black made no findings in her report about Deschamps's ability to work or otherwise function.  (*See* AR 427–31.)

Next, Deschamps claims that the ALJ should not have given great weight to the opinions of Drs. Patalano and Hurley because they did not review most of the treatment notes of Dr. Koo and Chassereau prior to making their opinions.  Generally, where it is unclear whether the consulting agency physicians reviewed all of the claimant's relevant medical information before making their opinions, these opinions will not override those of the treating physicians.  *See Tarsia v. Astrue*, 418 F. App'x 16, 18 (2d Cir. 2011) (agency

physician did not review evidence documenting an additional diagnosis and

recommendation for surgery).  In cases like this, however, where the agency consultant

opinions are supported by the record and there is no evidence of a new diagnosis or a

worsening of the claimant's condition after the consultant opinions were made, the ALJ may

rely on them.  *See Charbonneau v. Astrue*, Civil Action No. 2:11–CV–9, 2012 WL 287561,

at *7 (D. Vt. Jan. 31, 2012).  The treatment notes of Dr. Koo and Chassereau that were

admitted into the record after Drs. Patalano and Hurley completed their reports do not

document a deterioration or significant change in Deschamps's condition.  To the contrary,

an April 2015 treatment note written by Dr. Koo states that, although Deschamps still

experienced "a chronic lower level persistent depression," he "doesn't feel that he has had a

true bout of depression since his ex[] left years ago."  (AR 1357.)

Thus, these treatment notes would not have affected the opinions of Drs. Patalano or Hurley.

Deschamps next asserts that Dr. Reilly's opinions are worthy of less weight because

they state that Dr. Koo's diagnosis of depression ranged from mild to moderate when in fact

it ranged from moderate to severe.  (*Id.*)  As the Commissioner argues, however (*see* Doc.

14 at 23), Dr. Koo described Deschamps's depression as severe on only two occasions; most

frequently, he described it as moderate; and on three occasions he described it as mild.  (*See*

AR 42 (mild), 44, 46, 469, 471, 507, 509 (severe), 511, 531, 533 (severe), 535, 547, 584,

586, 1194, 1216, 1218 (mild), 1250, 1326, 1418, 1420 (mild), 1422, 1425, 1467, 1483,

1492, 1495.)

Deschamps asserts that Dr. Goldberg's opinions are worthy of less weight because

the Doctor referenced Deschamps's ability to play cards "frequently" (AR 734), but the

record (the May 2010 Function Report) demonstrates that Deschamps played cards for only two hours per week and could pay attention for only three minutes at a time (AR 340–41). (*See* Doc. 10–1 at 27.)  Dr. Goldberg relied on more than just Deschamps's ability to play cards to support his opinions.  (*See* AR 734 (citing Dr. Koo's findings).)  Moreover, playing cards for two hours each week could be considered "frequent" and could indicate, as Dr. Goldberg opined, that Deschamps had a higher degree of "recall and attention" than he claimed.  (*Id.*)

Finally, Deschamps asserts that the ALJ's analysis of the opinions of Dr. Pisanelli and Dr. Abramson was lacking.  (Doc. 10-1 at 28; *see* AR 485–92, 751–73.)  The ALJ stated as follows with respect to these consultants: "These sources . . . reviewed the medical record.  Their opinions are well explained and well[]reasoned.  They are also consistent with [Deschamps's] varied daily activities."  (AR 609.)  These findings are supported by the record, as discussed above, and Deschamps has pointed to no legal error.  Therefore the argument fails.

## Conclusion

For these reasons, the Court DENIES Deschamps's motion (Doc. 10), GRANTS the Commissioner's motion (Doc. 14), and AFFIRMS the decision of the Commissioner.

Dated at Burlington, in the District of Vermont, this 16th day of August, 2016.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

26